4NITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DONYLE T. WALKER o/b/o D.A.M.W.,

                    Plaintiff,

          -vs-

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

**No. 1:14-CV-00707 (MAT)**
**DECISION AND ORDER**

---

## I.    Introduction

Represented by counsel, Donyle T. Walker ("plaintiff") has brought this action on behalf of her infant son ("D.A.M.W.") pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' cross-motions for judgment on the pleadings. For the reasons discussed below, the Commissioner's motion is granted.

## II.   Procedural History

The record reveals that in March 2011, plaintiff filed an application for SSI benefits on behalf of D.A.M.W. (d/o/b September 3, 1999), alleging disability as of March 30, 2011. Plaintiff's application was denied, and she requested a hearing, which was held before administrative law judge David S. Lewandowski ("the ALJ") on October 22, 2012. The ALJ issued an unfavorable decision on March

4, 2013.  The Appeals Council denied review of that decision. This timely action followed.

## III. Summary of the Evidence

### A.   Medical Records

The medical record indicates that D.A.M.W., who was in sixth grade during the 2010-2011 school year, began treating with psychiatrist Dr. Samson Adegbite in March 2011. At that time, plaintiff reported that D.A.M.W. had a history of attention deficit hyperactivity disorder ("ADHD"). Mental status examination ("MSE") was unremarkable. Dr. Adegbite started D.A.M.W. on prescription medication for ADHD symptoms. In April 2011, plaintiff reported that D.A.M.W. was "doing well on current medication, [with] no side-effect of medication reported." T. 224. MSE was unremarkable.

D.A.M.W. also treated with counselors at Child and Family Services ("CFS"). Plaintiff reported that he had been suspended from school several times for "violent behavior," with the number of incidents estimated at 75. T. 255. She reported that he  had exhibited maladaptive social behaviors since pre-kindergarten. An assessment dated January 2011 recorded the following issues: "[D.A.M.W.] gets into verbal[] and physical[] fights, [he is] easily agitated, if someone hits him he explodes (pushes, punches . . .), one minute happy next minute, fidget[s], blurts out answers, talks during class, disrupts the class, talks back to teacher, needs reminders to stay on task, easily distracted, does not complete assignments, gets out of seat without permission.

Denies suicidal or homicidal thoughts. Feels picked on by peers."
Id. Treating sources at CFS diagnosed D.A.M.W. with ADHD. In June
2011, a treatment plan identified the following problems:
disciplinary issues at school, issues complying with rules at home,
problems getting along with others socially, and medication
management. In June 2011, D.A.M.W. was discharged from treatment at
CFS due to logistical issues his mother had transporting him there;
he was transferred to treatment at Monsignor Carr Institute.

State agency consultant Dr. J. Meyer completed a childhood
disability evaluation form in June 2011. Upon review of the
evidence available to him, Dr. Meyer opined that D.A.M.W. had no
limitation in acquiring and using information, moving about and
manipulating objects, and health and physical well-being. He opined
that D.A.M.W. had less than marked limitations in the remaining
domains. He provided no explanation for his findings. The ALJ gave
his opinion only some weight, noting that it did not "sufficiently
consider the effect of the claimant's social and behavioral
difficulties on the ability to learn and complete tasks." T. 46.

At Monsignor Carr, D.A.M.W. continued to treat with Dr.
Adegbite. As of September 2011, his treatment involved therapy
every 90 days, which treatment would be discontinued "when [his]
bullying and oppositional behaviors [were] eliminated as reported
by mother," when his anger management skills "increased
significantly," and when his "ability to focus has increased
significantly as reported by mother." T. 289.

In September 2011, Dr. Adegbite noted that D.A.M.W. reported feeling depressed on "more day[s] than not" but stated he did not have suicidal ideation. Dr. Adegbite opined that his concentration and attention span were "minimal" without medication; however, D.A.M.W. was medicated at that time. T. 279. Dr. Adegbite noted a current global assessment of functioning ("GAF") score of 35-40, with a past GAF of 45-50. See Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders-Text Revision ("DSM-IV-TR"), at 34 (4th ed., rev. 2000). On MSE in March 2012, D.A.M.W. exhibited a fair concentration/attention span, euthymic mood, affect appropriate to mood, fair judgment/insight, and adequate impulse control. He was noted to be "doing well on current medication." T. 281. In April 2012, it was once again noted that D.A.M.W. was doing well on medication but his Aderall was decreased due to the side effect of dizziness. MSE continued to be essentially unremarkable. Dr. Adegbite noted a good prognosis with continued treatment and therapy.

In May, June, and July 2012, D.A.M.W. reported no side effects from medication. MSE during both of those months continued to be essentially unremarkable. Dr. Adegbite also continued to note a good prognosis with continued treatment. In August 2012, it was noted that D.A.M.W.'s treatment sessions had been "lengthened as requested" by his mother. T. 299.

In a medical statement completed by Dr. Adegbite in September 2012, he noted diagnoses of ADHD, mood disorder, not otherwise

specified ("NOS"), and intermittent explosive disorder. Dr. Adegbite opined that D.A.M.W. had no limitation in caring for himself; moderate limitation in acquiring and using information and moving about and manipulating objects; marked limitation in interacting and relating with others; and extreme limitation in attending and completing tasks. Dr. Adegbite commented that D.A.M.W. had "significant limitation" in attention, completing tasks, and social interactions. T. 304.

On October 4, 2012, D.A.M.W. was admitted to Eastern Niagara Hospital after threatening to kill himself. Treatment notes indicated that his mother "had to physically restrain him as he had planned to obtain a knife from the kitchen." T. 322. "This was in response to mother setting limits on his [*sic*] due to his avoiding school, a pattern that started at the end of the last school year and seems to have started up again this school year." Id. D.A.M.W. reported that "his new stimulant medication did not seem to help him focus very well and that . . . made it very difficult for him to complete his work." Id. He also reported side effects from his medication including loss of appetite and insomnia.

Dr. Seth Dewey, who treated D.A.M.W. during his five-day stay at the hospital, opined that his depressive symptoms were associated with poor school performance and "seemed to reflect more demoralization than a true major depressive illness." Id. Dr. Dewey "did not . . . elicit any history that clearly suggested any psychotic symptoms," and D.A.M.W. "did not present as obviously

suffering from a major depression, psychotic illness, or mania." Id. at 322-23. Dr. Dewey changed D.A.M.W.'s prescriptions, noting that he had experienced problems adjusting to amphetamine prescriptions in the past. On December 8, 2012, one day before discharge, it was noted that D.A.M.W. was tolerating his new medication better than his old medication, but was still experiencing loss of appetite. MSE upon discharge was essentially unremarkable. Dr. Dewey noted "resolution of his suicidal ideation." T. 323.

Dr. Adegbite completed another statement on October 15, 2012, opining that D.A.M.W. had no limitation in moving about and manipulating objects, but marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. Dr. Adegbite noted, in reference to D.A.M.W.'s hospitalization, that he had become "acutely psychotic threatening to kill himself and had to be admitted to hospital inpatient care." T. 318. Dr. Adegbite also noted that D.A.M.W. treated with a social worker one to two times per month for counseling, and treated monthly with Dr. Adegbite for medication management.

After the ALJ's decision, plaintiff submitted a report prepared by school psychologist Lindsey Calabrese, M.S. That report, dated April 2013, noted that D.A.M.W. was currently in eighth grade general education classes and had "significant attendance problems." T. 24. Teachers reported that D.A.M.W. scored

"average" in reading and writing but "extremely below average" in math. Id. "He [had] very neat handwriting and perform[ed] well on English tests." Id. His disciplinary history over the last three years was "notable for conduct endangering the health/safety of others, bullying, disrespecting an adult, and chronic insubordination." Id. He had been absent 65 times and tardy six times during the 2012-2013 school year.

During Ms. Calabrese's behavioral assessment, D.A.M.W. "presented as polite and cooperative," "willingly attended test sessions and easily established rapport" with Calabrese, "was prompt and careful in responding and remained focused on the tasks presented," and "appeared to put forth his best effort and generally persisted at tasks increased in difficulty, although he gave up easily at times." T. 24-25. His test results indicated a full-scale IQ of 92, with a verbal comprehension index of 95, a perceptual reasoning index of 98, and processing speed index of 100. He was assessed in the average range of intellectual functioning. Ms. Calabrese opined that D.A.M.W. presented with "[c]linically elevated Internalizing Problems and School Problems," and based on his mother's reports, presented with "[c]linically elevated Externalizing Problems and Internalizing Problems." T. 27.

**B. Educational Records and Testimony**

Educational records from the 2010-2011 school year recorded numerous suspensions, both in and out of school, for various disciplinary incidents involving D.A.M.W.'s aggression toward

peers. For example, D.A.M.W. "scraped" another student with an object, kicked other students under the table and refused to stop when prompted by a teacher, pushed another student into the wall, and wrote in pen on another student's shirt. One teacher recorded an in-school suspension in March 2011, noting that D.A.M.W. "[did] NOT follow rules, [did] what he want[ed], ha[d] temper tantrums, [did] not listen, disrupt[ed] everyone else, . . . [did] NO work or reading, day after day, also [made] fun of other students (bullying)[.]" T. 180 (emphasis in original).

A teacher questionnaire was completed in June 2011 by four of D.A.M.W.'s teachers and school nurse Sherif Szymanski, RN. At that time, plaintiff had not exhibited an unusual degree of absenteeism. In the domain of acquiring and using information, his teachers assessed him as having a "very serious" problem in providing organized oral explanations and adequate descriptions, "serious" problems in understanding and participating in class discussions and applying problem-solving skills, and an "obvious" problem recalling and applying previously-learned material. Several "slight" problems were noted as well. In regard to this domain, a teacher noted that he "struggle[d] with class discussions and social interactions." T. 166.

In the domain of attending and completing tasks, D.A.M.W. was noted to have serious problems focusing long enough to finish assigned activities or tasks and refocusing to task when necessary. These problems were noted to occur on an hourly basis. He had

obvious problems carrying out multi-step instructions and working at a reasonable pace/finishing on time. He was also noted to have several slight problems. A teacher noted that these ratings were "based on [teachers'] observations after the student began taking medication. Prior to the medication, [he] <u>struggled</u> immensely with all behaviors listed above." T. 167 (emphasis in original).

In the domain of interacting and relating with others, teachers opined that D.A.M.W. had very serious, hourly problems in making and keeping friends, relating experiences and telling stories, and introducing and maintaining relevant and appropriate topics of information. He had a serious, hourly problem in playing cooperatively with other children, and an obvious, daily problem using language appropriate to the situation and listener.

D.A.M.W. was not noted to have any serious problems in caring for himself, although teachers noted that they were "concerned about his lack of social interaction with his peers and teachers/adults in school." T. 170. No problems were noted in the remaining domains.

D.A.M.W. testified at his hearing that he did not get along with teachers, his grades were "[h]orrible," and when asked if there was "anything [he] enjoy[ed] doing," he testified, "[n]o." T. 61. He testified he did not do his homework because he did not want to and he did not do chores. Plaintiff's mother testified that he refused to do chores when he did not want to do them. She stated that she "[had] been getting calls from all of his teachers saying

that he misses his assignments often, he refuses to do his work,
[and] he has been on lunch detention every day." T. 67. She
testified that in early October, she confronted D.A.M.W. about
missing school, he "got frustrated" with her, "starting to throw
things at [her]," and then "said he wanted to kill himself," at
which point she restrained him. T. 68. She also testified that the
new medication he received at the hospital was not working, and
that he had been prescribed new medication. She described an
incident in which she attempted to have D.A.M.W. eat dinner at the
table with her on a counselor's suggestion, but he refused to do so
and "broke the legs off the chairs." T. 72.

## IV.  The ALJ's Decision

The ALJ found, at the first step, that D.A.M.W. was a school-
age child at the time of the application and was an adolescent at
the time of the decision, see 20 C.F.R. § 416.926a(g)(2)), who was
not engaged in substantial gainful activity. At the second step,
the ALJ found that D.A.M.W. suffered from the severe impairment of
attention deficit hyperactivity disorder ("ADHD").

At the third step, the ALJ found that D.A.M.W. did not suffer
from an impairment or combination of impairments that met or
medically equaled the severity of one of the listed impairments in
20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924,
416.925, 416.926). The ALJ found that plaintiff did not meet the
criteria of listing 112.11, reasoning that there was "no evidence
in the record of marked inattention, marked impulsiveness, and

marked hyperactivity." T. 43. In coming to his decision, the ALJ considered D.A.M.W.'s functioning in the six domains, and assessed a marked limitation in interacting and relating with others; less than marked limitations in acquiring and using information, attending and completing tasks, caring for himself, and health and physical well-being; and no limitation in moving about and manipulating objects.

## V.   Discussion

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). The plaintiff must show that: (1) the child was not engaged in substantial gainful activity; (2) the child had a "severe" impairment or combination of impairments; and (3) the child's impairment(s) met, medically equaled, or functionally equaled the severity of a listed impairment. 20 C.F.R. § 416.924. At the third step, "[f]or a child's impairment to functionally equal a listed impairment, the impairment must 'result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.'" Encarnacion ex rel. George v. Astrue, 586 F.3d 72, 75 (2d Cir. 2009) (quoting 20 C.F.R. § 416 .926a(a)). A child's

11

limitations are evaluated in the context of the following six

domains of functioning:

    (1)  acquiring and using information;
    (2)  attending and completing tasks;
    (3)  interacting and relating with others;
    (4)  moving about and manipulating objects;
    (5)  caring for oneself; and
    (6)  health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

     A   district   court   may   set   aside   the   Commissioner's

determination that a claimant is not disabled only if the factual

findings are not supported by "substantial evidence" or if the

decision is based on legal error. 42 U.S.C. § 405(g); see also

Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003).

"Substantial evidence means 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" Shaw v.

Chater, 221 F.3d 126, 131 (2d Cir. 2000).

     Plaintiff contends that (1) the ALJ failed to properly apply

the treating physician rule; (2) new evidence submitted to the

Appeals Council reasonably could have changed the ALJ's decision;

and (3) plaintiff met the requirements of listing 112.11, which

defines ADHD.

     **A.   Application of the Treating Physician Rule**

     The treating physician rule provides that an ALJ must give

controlling weight to a treating physician's opinion if that

opinion is well-supported by medically acceptable clinical and

diagnostic techniques and not inconsistent with other substantial

evidence in the record. See <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. § 416.927(c)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)).

Plaintiff argues that the ALJ erred in giving little weight to Dr. Adegbite's two treating opinions. The ALJ discussed those opinions in the context of the entire record, reasoning:

> Although he is a treating source, it is noted that Dr. Adegbite's opinions feature significant variations in the degree of stated limitations, despite being issued only one month apart from each other (September and October 2012). Moreover, the later issued opinion gives no reason for the dramatic change in opined limitations. Although the hospitalization for suicidal ideation occurred between the dates of the two reports, this alone does not sufficiently account for the increased level of opined restriction in acquiring and using information, or the decreased level of opined restriction in attending and [completing] tasks. The claimant's medications appear to be working and there is no support for marked limitations in caring for himself, as opined by Dr. Adegbite. Furthermore, as noted above, the claimant was considered to be in good condition upon discharge from the hospital, and underwent a thoroughly normal mental status evaluation. Additionally, Dr. Adegbite's own treatment notes indicate that the claimant does well in school and is doing well with his medications.

T. 46 (citations omitted).

The ALJ's reasons for rejecting Dr. Adegbite's opinions were sound and supported by substantial evidence in the record. Although D.A.M.W. was hospitalized during the period between Dr. Adegbite's

two opinions, that hospitalization, however, does not account for the differences between the two opinions for the following reasons. First, D.A.M.W. exhibited no psychotic illness, major depression, or mania while hospitalized, and was assessed with normal mental status upon discharge. Second, Dr. Adegbite's opinion of D.A.M.W.'s functioning did not simply worsen after D.A.M.W.'s hospitalization, but inexplicably changed: for example, Dr. Adegbite found in his second opinion that D.A.M.W. no longer exhibited any problems in moving about and manipulating objects or in health and physical well-being. As the ALJ described, Dr. Adegbite's opinions were internally inconsistent as well as inconsistent with his own treatment notes, which indicated consistent normal mental status examinations and a good prognosis with continued treatment and medication. See Kirk v. Colvin, 2014 WL 2214138, *7 (W.D.N.Y. May 28, 2014) ("Inconsistencies between [the treating physician's] treatment notes and final opinions constitute 'good reasons' for assigning her opinions non-controlling weight.") (citing Campbell v. Astrue, 2013 WL 1221931, *2 (W.D.N.Y. June 29, 2013) (stating an ALJ may "properly discount" a treating physician's opinion if it is inconsistent with "[her] own treatment notes")).

Moreover, Dr. Adegbite's opinions were also inconsistent with the opinions of D.A.M.W.'s teachers, which the ALJ properly accorded great weight. The teacher questionnaire indicated that D.A.M.W. exhibited problems with attention and concentration, but that those problems had improved with medication. Additionally, the

questionnaire emphasized social functional limitations, a domain in which the ALJ found that D.A.M.W. had marked limitation. A review of the record reveals that D.A.M.W. tested at average intelligence in school and, when he attended, had decent grades. Upon review of the entire record, it is apparent that D.A.M.W.'s limitations were primarily social in nature, centering on bullying issues with peers and refusal to follow the directives of teachers and his mother. The Court thus concludes that the ALJ properly determined that most of the academic issues reported by teachers were due to "social difficulties rather than to intellectual limitations," when considered in the context of the entire record of D.A.M.W.'s education and medical treatment. T. 45. Therefore, the record evidence does not support the conclusion that D.A.M.W.'s medically determinable impairment of ADHD "*result[ed]*" in the limitations necessary to find that a listing was functionally equaled. Encarnacion, 586 F.3d at 75 (emphasis added).

### B.   New and Material Evidence

Plaintiff argues that the evaluation submitted by school psychologist Calabrese should have been considered by the Appeals Council as reasonably likely to change the ALJ's decision with regard to disability. As recounted above, that evaluation found that D.A.M.W. had average intelligence, and actually reported significantly favorable compliance with testing procedures upon evaluation.

The Court does agree with plaintiff that the report relates to the time period prior to the ALJ's decision, contrary to the Appeals Council's finding that it was "about a later time." See T. 2. However, in order to establish that evidence is new and material, and thus warrants reconsideration of the Commissioner's decision, an appellant must show that the evidence was not only absent from the record during the administrative process, but also that the evidence is "both relevant to the claimant's condition during the time period for which benefits were denied[,] *and probative*." Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991) (emphasis added) (quoting Tirado v. Bowen, 842 F.3d 595, 597 (2d Cir. 1988) (internal quotation marks and citations omitted)).

Ms. Calabrese's report is not probative because it does not significantly alter the analysis of D.A.M.W.'s impairments during the relevant time period. For the most part, the report summarizes plaintiff's prior complaints about D.A.M.W.'s behavior and notes his more recent problem of excessive absenteeism. However, the report does not add any appreciable new information regarding plaintiff's limitations in any of the relevant domains of functioning, nor is it particularly relevant to the consideration of any listing. Because  the report "adds no new perspective to a consideration of his condition during the relevant time period, the evidence is [not] probative." Reynolds ex rel. E.S.R. v. Colvin, 2015 WL 6126945, *5 (W.D.N.Y. Oct. 16, 2015).

**C.    Listing 112.11**

Finally, plaintiff argues that the ALJ erred in finding that D.A.M.W. did not meet the criteria of listing 112.11, which defines ADHD. That listing requires, as a threshold, that a claimant demonstrate "[m]edically documented findings" of marked inattention, marked impulsivity, *and* marked hyperactivity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11. As noted above, the ALJ found that D.A.M.W. did not meet this listing because there was "no evidence in the record of marked inattention, marked impulsiveness, and marked hyperactivity." T. 43. The Court agrees.

Numerous mental status examinations over D.A.M.W.'s treatment history were unremarkable. In fact, when D.A.M.W. was properly medicated for ADHD, not a single mental status examination noted a significant abnormality in attention, impulsiveness, or hyperactivity. Dr. Adegbite never noted hyperactivity, and repeatedly noted that D.A.M.W.'s impulse control was adequate and his concentration and attention span were fair. School psychologist Calabrese also noted persistent attention to and concentration on tasks, as well as a quick establishment of proper rapport with Ms. Calabrese, with no notation of hyperactivity. Therefore, the ALJ's consideration of this listing was proper and supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the pleadings (Doc. 7) is denied, and the Commissioner's cross-motion (Doc. 13) is granted. The ALJ's finding that D.A.M.W. was

not disabled during the relevant period is supported by substantial evidence in the record, and accordingly, the complaint is dismissed in its entirety with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

**S/Michael A. Telesca**
HON. MICHAEL A. TELESCA
United States District Judge

Dated:    December 21, 2015
          Rochester, New York.